# Appeal of W. W. Winton et al.

1. G leased to O the right to mine a million tons of coal from his land and covenanted in the lease that if he "should grant any other lease to mine coal in any of such land . . . . . O should have the first refusal of any such lease or leases." O afterwards, with the assent of G in writing, assigned said lease to W. C. & Co. One of the firm of W. C. & Co. subsequently died. The surviving members of the firm and the administrator of the deceased member of said firm transferred the lease to G, inserting the following clause in the instrument transferring it: "It is understood that the parties of the first part do not part with any prior rights of leasing mentioned in the G lease." G died testate, and his executors afterwards executed a lease to J without first having made a tender of it to the surviving members of W. C. & Co. The surviving members of W. C. & Co. presented their claims to the Orphans' Court for damages for breach of the said covenant of G to O, against the estate of G, and claimed the right to participate in the distribution of the fund in the hands of the executors of G.

   *Held* (*a*), That the Orphans' Court did not have jurisdiction to entertain the claim; (*b*) That the right of "refusal" was an inseparable incident of the lease—a personal right that could be exercised only by the lessee himself as tenant of the demised premises; (*c*).That the surviving assignees of the lease had no right to demand that any subsequent lease should be first tendered to them.

2. The Orphans' Court does not have jurisdiction in the distribution of the funds of an estate to entertain a claim for damages arising from the acts of the executors of that estate.

3. Only those who claim through the decedent as creditors, legatees, or next of kin, have any standing in a proceeding for distribution in the Orphans' Court.

4. McBride's Appeal, 72 Pa. St. R., 480; Braman's Appeal, 89 Id., 78, followed.

January 5th, 1886.     Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Orphans' Court of *Philadelphia county:* Of January Term, 1885, No. 18.

Appeal of W. W. Winton, J. M. Chittenden and S. N. Chittenden, surviving members of the firm of Winton, Cone & Co., from a decree of said court dismissing the exceptions to and confirming absolutely the adjudication of the auditing judge, making distribution of the fund in the hands of the executors of the last will and testament of John Gibson, deceased, as shown by their third account filed April 21st, 1881.

In making the adjudication, PENROSE, J., filed an opinion containing, *inter alia,* the following:   The facts with regard to the claim of Winton, Cone & Co., are as follows:

On the 13th of August, 1858, the testator, John Gibson, by instrument under seal of that date, granted, demised and let to John P. Offerman, his heirs, executors, administrators, and assigns, the right and privilege to mine, dig and carry away coal above and below water level in and from the lands of the lessor, on the east side of the Lackawanna river, in the townships of Blakely and Carbondale, Luzerne county, in the warranty names of James and Peter Ryder and William Ryon—containing 1,050 acres, more or less; the coal to be mined and delivered to the Delaware and Hudson Canal Company, in yearly quantities, as provided for in a contract of the same date between that company and the said Offerman; the same to be paid for at the rate of fifteen cents per ton in monthly settlements at the office of the said company in the City of Carbondale.   The lessee to have the privilege of mining from such points of water level, and from such vein or veins as he might select, &c., &c.   It was also agreed that the lease should not be assigned or transferred, in part or in whole, or the premises or any part thereof sublet without the consent in writing of the party of the first part, his heirs and assigns first had and obtained.   It was also agreed, that the privilege of mining thereby granted should only extend to such boundaries as "might be necessary to enable the party of the second part to fulfill his contract with the Delaware and Hudson Canal Company, and should the party of the first part grant any other lease to mine coal in any of the demised lands or on his lands on the west side of the Lackawanna river, which lease shall not interfere with the mines that may be opened by the party of the second part, the party of the second part shall have the first refusal of any such lease or leases."   The party of the second part or his assigns to have the right of way over

the surface of the tracts and the free use of such portions of the same as might be necessary for the convenient prosecution of his mining operations.

The lease to continue in force until one million of tons of 2,464 pounds shall have been mined and taken out as provided for in the said contract, between Offerman and the Delaware and Hudson Canal Company, for the delivery of coal to said company.

The lease was acknowledged October 9, 1858.

\*          \*          \*          \*          \*          \*

. By instrument under seal without date, John P. Offerman assigned his lease as follows: "For and in consideration of the sum of one dollar to me in hand paid by Messrs. W. W. Winton, George Cone, J. M. Chittenden, and Samuel N. Chittenden, as well as other valuable consideration paid by them to me, I do hereby assign, transfer and set over to them, their heirs, executors, administrators and assigns the within lease and supplement and all rights I have by virtue of the same."

The assent of Mr. Gibson to this assignment was as follows: For valuable consideration to me in hand paid, I do hereby assent to the above assignment and transfer of the within lease and supplement, made by John P. Offerman to W. W. Winton, George Cone, J. M. Chittenden, and S. N. Chittenden, it being understood and agreed that the aforesaid leases are intended to cover the use of the Keystone Saw Mill, together with all the houses now erected, with the necessary surface for the same for the full time of the lease, also all the surface now enjoyed by Offerman until I may require the same for additional improvements.

"In consenting to this agreement it is understood and agreed that all repairs required to be made to the buildings, machinery and dwelling houses except such as may be necessary from casualties that may arise by fire or otherwise shall be made by the lessees at their own proper cost and expense, and that the lessees shall, at the expiration of the lease, give full and quiet possession of all the premises hereby leased in as good order and condition as they now are, natural wear and tear or casualties that may accrue by fire or otherwise excepted."

It will be observed that in this paper Winton *et al.* are spoken of, not as assignees, but as lessees; and that it is stipulated that at the expiration of the lease, they shall give full and quiet possession of the premises, nothing being said of a right of renewal or privilege of refusal.

On the 24th of December, 1864, an agreement was entered into between "W. W. Winton, J. M. Chittenden and S. N. Chittenden, surviving partners of the late firm of Winton,

[Appeal of Winton.]

Cone & Company, and W. W. Winton and Dorastus Cone, administrators of the estate of George Cone, deceased, late member of said firm," of the first part, and John Jermyn of the second part, which after reciting the lease by Mr. Gibson to Offerman, the concurrent agreement of Offerman with the Canal Company, the assignment by Offerman to Winton, Cone and the two Chittendens, "whereby all rights and privileges arising from his leasehold interest became absolutely vested in them the said W. W. Winton, George Cone, J. M. Chittenden and Samuel N. Chittenden as partners under the name and firm of Winton, Cone and Company," and that there remained yet to be mined about 800,000 tons, provided that the said Jermyn should enter upon the property aforesaid and use and occupy the mines, gangways, &c., &c., as then established and lately operated by Winton, Cone and Company for the purpose of mining said coal as therein stipulated and for that purpose only ; the said Jermyn to have such portions of the surface and all of the buildings then left that the said Winton, Cone and Company acquired by virtue of the assignment from Offerman for the unexpired term of said lease.   In consideration of·which Jermyn agreed to mine " the aforesaid quantity of coal at his own risk and expense " at the rate of 16½ cents per ton of 2,240 pounds, 90,000 tons at least to be taken in each year, payments to be made monthly to the Delaware and Hudson Canal Company, ten cents per ton to be credited to John Gibson, and six and one-half cents to the credit of Winton, Cone and Company.   In case of failure to mine the stipulated quantity, payments to be made therefor, nevertheless, with the right on the part of the party of the first part, in the event of failure to comply with the stipulations of the agreement by Jermyn, to declare the lease forfeited, and take possession, Jermyn agreeing, also, to pay for the use of the surface and the buildings then left acquired by Winton, Cone and Company by the assignment from Offerman, $100 per month, payable to the Delaware and Hudson Canal Company to the credit of John Gibson and the said Winton, Cone and Company.   " When the supposed 800,000 tons shall have been mined or paid for. . . . . . then all rights of the second party terminate, and the second party agrees to quit, surrender and give peaceable possession of the premises, and to return to the parties of the first part their heirs, executors, administrators, or assigns the same weight of iron, length of roads, and all fixtures, appurtenances, buildings, machinery, &c., in as good condition as when taken, natural wear and tear or casualties that may occur by fire or otherwise excepted. This reservation or exception, however, not to apply to the

weight of iron, it being understood that the first party owned the gangway, roads, &c."

"It is further understood that the parties of the first part do not part with any prior rights of leasing mentioned in the Gibson lease."

This agreement was signed and sealed by W. W. Winton, J. M. Chittenden, S. N. Chittenden and the "administrators of the estate of George Cone, deceased, late member of Winton, Cone and Company," with the assent of the parties in interest in the estate of George Cone.

Upon the same day (December 24th, 1864), the mules, cars and all personal property belonging to the said Winton *et al*, connected with the said mining operations were sold by them to Mr. Jermyn.

The lease, or assignment of lease, by Winton, Cone and Company to John Jermyn was not presented to Mr. Gibson during his lifetime, nor to his executors or trustees after his death for approval. If the former are to be regarded simply as assignees of the lease of Offerman, such approval was, perhaps, unnecessary. A condition in restraint of alienation by a lessee does not extend to his assignees: Dumpor's case, 4 Coke, 119; and the same appears to be the law in the case of a covenant: Pennant's Case, 3 Coke, 64; Platt on Covenant, 26; 4 Kent, 124, note B. If, as would seem to be the case, the agreement of Mr. Gibson to the assignment by Offerman is to be regarded as a new and original lease to Winton, Cone and Company, the assent of the lessor to an assignment by them was certainly unnecessary.

Mr. Gibson died, as already stated, March 11th, 1865, less than three months after the lease or assignment by Winton, Cone and Company to Jermyn. Two years afterwards, viz: January 23d, 1867, Mr. Jermyn being then in the occupancy of the mine, Henry C. Gibson and James T. Young, styling themselves executors of the last will and testament of John Gibson, leased "unto the said John Jermyn his heirs and assigns, one million tons of anthracite coal contained in the vein," then "being worked by the said John Jermyn at the colliery of the said party of the first part in said townships of Blakely and Carbondale, late the property of John Gibson, deceased, lying or being on or under that certain piece or parcel of lands, situate in the townships of Blakely and Carbondale, County of Luzerne, State of Pennsylvania, containing 1,800 acres, more or less," with the right to enter upon said lands, erect necessary machinery, etc., etc., the said John Jermyn covenanting to erect at a suitable location on said land, on or before the first day of January, 1868, a coal breaker with engine, machinery and apparatus sufficient for mining not less than

100,000 tons of coal per annum ; he agreeing to mine and pay for not less than 100,000 tons per annum, provided the coal could be mined, etc., at an expense not greater than that required for mining from the mines of the Delaware and Hudson Coal Company ; with provisions for the event of " faults " occurring in said veins of coal, etc., etc., or for the exhaustion of the mines or the coal becoming unmerchantable in quality, etc., etc.

The coal so taken to be paid for at the rate of ten cents per· ton of 2,240 pounds clean merchantable coal.

It was further agreed by the lessee that he would " work the said vein of coal upon the land hereby leased continuously, and as soon as opened, etc., etc.

At the expiration of the lease, the lessors to purchase and pay for, at a valuation to be made by disinterested persons, the breaker, steam engine, machinery, railroad tracks, etc., etc., covenanted to be erected by the lessee for the purpose of mining under said lease.

It was further agreed that the lease thus made should be subject to the lease or agreement between the testator and Offerman, and to a contract of even date with the lease then granted between Jermyn and the Delaware and Hudson Canal Company, such contract being similar to that made between Offerman and the Canal Company.

This lease was duly acknowledged July, 1867, and recorded in the Recorder's Office in Luzerne County.

It will be observed that this lease contemplated the opening of new mines, and their simultaneous working with the openings under the Offerman lease ; and that while the latter covered tracts containing only 1,059 acres, the new lease embraced 1,800 acres, more or less.

The Offerman lease had several years yet to run, and the new lease can in no sense be regarded as a renewal of it.

It is to be observed, also, that while the lessors style themselves " executors " of John Gibson, deceased, in granting this lease, they really acted as trustees. It is true the will gave the executors a power of sale ; but until such power was exercised, the land would pass to the devisees, viz.: the trustees, subject to being divested by the exercise of the power : Blight *v.* Wright, 1 Phila., 549. It is true, also, that a power of sale may imply a power to lease ; but such implication would seem to be repelled in the present case, as a matter of construction, by the fact that the power to lease is in express terms granted by the testator to the trustees.

Under the provisions of the lease of January 23d, 1867, Mr. Jermyn erected a breaker and machinery necessary for mining coal, and opened new mines, at an expenditure of from $75,000

to $80,000. His preparations were not completed until about January, 1868. He then began mining at the rate of 100,000 tons a year,—working at the same time, under the Offerman lease, the mining under which was completed in 1873. The million of tons stipulated for by the lease of 1867 were not taken out till 1878, the property in the meantime having been sold by the executors, viz.: February 1st, 1873, to the Northern Coal and Iron Company.

More than fourteen years after the lease by the accountants to Mr. Jermyn, viz.: On the 31st of May, 1881, when the present account was called for audit, claim was, for the first time, made by Winton, Cone and Company for an alleged breach of the testator's covenant or alleged covenant with them,—damages being stated at the sum of $150,000.

Mr. Winton and the Messrs. Chittenden were aware of the lease made to Mr. Jermyn at or about the time of its date. Jared Chittenden was in the employ of the Delaware and Hudson Canal Company as inspector of coal, and was in almost daily communication with Mr. Jermyn. The sale made by the executors to the Northern Coal and Iron Company, which was consummated February 1st, 1873, was negotiated through the agency of Samuel N. Chittenden, who received a commission from the executors of $10,000 for his services. At no time during the fourteen years which preceded the presentation of this claim in this court, was there any communication whatever from Winton, Cone and Company to the accountants, alleging or pretending any claim against the estate of the testator or against the executors or trustees. Nor in his personal interviews with them relative to the sale of the said lands by Mr. Chittenden, was there any suggestion by him of the existence of any such claim or allegation of a breach of covenant so far as Winton, Cone and Company were concerned. Nor did the accountants have any knowledge whatever from any source that a liability was claimed until their account was called for audit, May 31st, 1881, as already stated. The most that the claimants were able to show was that soon after the lease to Mr. Jermyn, Mr. Winton and Mr. Jared Chittenden, in a casual interview with him, had said that " by rights they ought to have had the new lease;" but they made no complaint that it had not been given to them, nor did they say that they expected to have it, or that, if offered to them, they were in a position to take it. Mr. Cone was dead, their partnership was dissolved, their machinery and tools had all been sold to Mr. Jermyn, and Jared Chittenden was then in the employ of the Delaware and Hudson Canal Company; and it would seem clear, therefore, that if it had been offered to them, they would not have been in a position to have accepted it. The right of

surviving partners to accept the lease, which would have required, under its provisions, an outlay of nearly $100,000, is perhaps more than doubtful.

It is now claimed that the covenant of Mr. Gibson with John P. Offerman to give him the refusal of any lease to mine coal on his lands passed by the assignment to Winton, Cone, & Company; that such right remained in them after the death of Mr. Cone, notwithstanding their lease or assignment to Mr. Jermyn; that it was the duty of the accountants to have offered the lease to them before granting it to Mr. Jermyn; and that, without showing their own readiness or ability to accept, by reason of the failure to make such offer, the estate of the testator had become liable to them in damages, to be measured by the difference between the amount paid by Mr. Jermyn, and what, as the claimants allege, the royalty was worth, viz.: twenty-five cents per ton instead of ten cents as stipulated, in the lease; this difference of fifteen cents per ton, amounting upon a million of tons, to $150,000, with interest thereon from the time when they ought to have received the money as they allege, being the claim now presented.

It must be conceded that the claim is a startling one, and that the delay in its presentation does not commend it to the favorable consideration of a court charged with the duty of protecting the estates of dead men.

I. The first question that arises is with reference to the jurisdiction of the Orphans' Court to entertain such a claim at all.

Whether a claim for damages arising from the act of a decedent himself, unliquidated and incapable of liquidation by mere arithmetical calculation, can be regarded as a debt within the meaning of the Acts of Assembly conferring jurisdiction on the Orphans' Court to make distribution among creditors, until its amount shall have been ascertained by a jury in the courts of common law is, in the opinion of the auditing judge, a more than doubtful question.

But it is clear that the debts in payment of which the Orphans' Court is authorized to apply the assets of a decedent, are those contracted by himself, and which are either due (*debitum in presenti solvendum in futuro*) or at least inchoate at the time of his death. At that moment, the *status* is fixed, and the estate becomes a trust fund for the payment of claims then existing. This is made clearer from the provision of the law with regard to the lien of debts, and limiting such lien, in the absence of suit, to five years from the decedent's death.

Here it is not pretended that any breach took place during the lifetime of the testator. At his death, his lands passed by devise to his executors or his trustees. A devisee takes by

purchase, and his act is no more the act of the testator than that of a purchaser of any other kind would be. In this case, there is no covenant on the part of the testator for any one but himself. If, however, his covenant is one which runs with the land, it binds not his executors, but his heirs or devisees. If claim can be made against his estate for a breach of covenant occurring two years after his death, it can, with equal propriety, be made twenty years after. That this cannot be, is decided by Quain's Appeal, 10 Harris, 510; Williams's Appeal, 11 Wr., 283. It was said in this last case that the executors of a covenantor, whose covenant running with the land was broken after his death, might be sued (in common law courts), but that the judgment would be restricted to the lands. In the present case, there could be no such judgment even in the common law courts, because the lien of claims against the decedent's estate has expired as against his heirs and devisees: Hope v. Marshall, Leg. Int., 1881, p. 308.

See further, as to breach of covenant real after death of covenantor, Bland v. Umstead, 11 H., 317; Dickerson v. Callahan, 7 H., 227; Carr v. Lowry, 3 Casey, 257.

If, as decided in these cases, the personal representatives can only be held for a breach of covenant occurring during the lifetime of their decedent, it is clear that the Orphans' Court is not the tribunal before which this claim can be made. It was held in McBride's Appeal, 22 P. F. S., 480, that in a proceeding for distribution in the Orphans' Court, no one can claim but through the decedent as creditor, legatee or next of kin. And where the wrong which is complained of is the act of the accountant and not of the decedent, the estate of the latter is not liable: Braman's Appeal, 8 Norris, 78.

It may be added, even if the court had jurisdiction, that so far as the lands of the decedent were concerned, the lien of any claim arising from the breach by accountants in 1867 ceased after the lapse of five years, no suit having been brought. The proceeds of such lands, when sold, therefore, after that time, must equally be discharged.

II. But, concede the jurisdiction of the court, and the liability of a decedent's estate for the act of an executor, has there been a breach of covenant so far as the present claimants are concerned?

In the lease from the testator to Offerman, while the demise is to him, "his heirs, executors, administrators, and assigns," and the surface right of way is to him and his "assigns," the covenant as to new leases is with him alone, without words of assignability. It might well be argued, therefore, as a matter of construction, that it was not intended that the right should pass to his assigns or be other than personal merely.

[Appeal of Winton.]

If, however, the right passed by an assignment of the lease, it is simply an incident thereto, to be held by the tenant as a tenant, and inseparable from the tenancy. It would follow, therefore, that it was not competent for Winton, Cone & Company, when they assigned their lease to Mr. Jermyn (their lease to him of their entire interest in the mines, &c., being an assignment, though not in terms so called), to separate the incident from the principal, and afterwards claim any right thereunder from the lessor. If, as already intimated, the assent of Mr. Gibson to the assignment by Offerman to Winton, Cone & Company is to be regarded (not simply as an assent, but) as a new lease embracing the subject of the old one and something more, there never was at any time a right on the part of Winton, Cone & Company to a new lease; since it is there expressly stipulated that they will surrender possession at the expiration of the term.

But if we concede the right ever to have been in the claimants and that it remained with them notwithstanding their assignment, and that the omission of the accountants to offer the new lease to them before granting it to Mr. Jermyn constituted a breach, the damages for such breach would be nominal unless it could be shown by the claimants that they were ready, willing and able to accept it. If they were not, a tender would have been an idle ceremony. Not only were such willingness and readiness on their part not shown, but as already stated, it affirmatively appeared they were not in a position to have accepted it. It is said in Wood on Landlord and Tenant, p. 675, that where a lessor having covenanted to renew, has by alienation or otherwise put it out of his power to perform, the tenant must offer to perform in order to perfect his right.

It is far from clear that the lease to Jermyn could, under any circumstances, have been regarded as a breach of the covenant with reference to new leases. The new lease, the refusal of which was to be offered to the lessee was, as the lease expressly stipulated, to be one which should "not interfere with the mines that may be opened by the party of the second part." With the mines thus opened in the occupation of one tenant, a new lease of mines to be opened side by side with them, would manifestly interfere; and the competition thus brought about might be destructive of the rights of the existing tenant.

III. Let us concede, however, the jurisdiction, the right of the claimants, their readiness to perform and the breach. The question yet remains, What is the measure of damages?

That their rights were held by them as a firm is conclusively proved by their agreement under seal with Mr. Jermyn, which

repeatedly asserts the fact.    The firm having dissolved, it would have been impracticable for the liquidating partners to have carried on a business such as was contemplated by the lease.    All that they could have done, therefore, was to have sold it as an asset of the firm ; and it would seem, therefore, that the measure of damages, so far as they are concerned, would be the price which such an asset, if offered for sale, would have brought. · No evidence of this kind was produced.

Adopting, however, the standard of the claimants themselves, the auditing judge is of opinion that the evidence does not show the price agreed to be paid by Mr. Jermyn by the lease of 1867 to be less than what, at that time, could have been obtained.

It is true that a number of highly respectable witnesses having a greater or less knowledge of coal operations, were called by claimants and testified that in their opinion a royalty, such as that given by the lease to Mr. Jermyn, was worth 25 cents per ton ; but it is manifest, from the cross-examination of these witnesses, that their knowledge of the condition of this particular property, or the value of royalty at the time the lease was made, was not such as to render their opinions valuable, especially when opposed by the facts which they themselves mention, and by the conduct of the claimants.  No evidence is more calculated to mislead than that of experts giving their opinion as to the value of royalty.    Royalty, or as it is sometimes called, coal or ore leave, is a price paid for the privilege of raising coal or ore.    Manifestly, it can have no fixed value, but must depend on the quality of the coal or ore, the facility for mining, the locality, amount of pumping required, proximity and accessibility to market, &c., &c.    This is well illustrated by the testimony of Judge Hand, a witness on the part of claimants, who stated in his cross-examination, that in the Lackawanna region, in the vicinity of the Jermyn mines, the price of royalty varied from eight to twenty-five cents, the causes of the difference being a greater or less ease of mining, the fact of the mines being above or below water level, and, to some extent, the state of the market at the time when the lease was made.    Another of claimants' witnesses, John R. Davis, stated in his cross-examination that while at one mine he paid a royalty of $12\frac{1}{2}$ cents, at another on the same property and adjoining it, he paid a royalty of 22 cents. Under a lease made in 1857 and renewed in 1869, of a vein of Archbald, two miles from the Gibson property, and believed to be the same vein, Edward Jones, another witness of claimants, paid a royalty of 14 cents per ton — the greater part of his mines being above water level, and the lessor being bound to pay for the cost of breaker at the expiration of the lease.

The Gibson mines are all below the water level.  Judge Lewis Jones, another witness of claimants, in his cross-examination testified that prior to 1870, few leases were made.  That in 1872 and 1873 there was more activity, but before that it was "pretty dull."

It would appear from the evidence that there had been for some time past a gradual appreciation in the values of royalty. But that this was not always the case is shown by the papers now before the court.  Under the original lease in 1858, by Mr. Gibson to Mr. Offerman, the royalty stipulated for was 15 cents; 'while, under the supplemental agreement made in March, 1862, the rate was reduced to 10 cents per ton, though the price of coal had increased from 82½ cents per ton to 90½ cents.

The claimants themselves assigned to Mr. Jermyn an open mine in working operation requiring the erection of no breaker or machinery, and involving the risk of little or no capital, at a royalty of 16½ cents per ton.  The lease of the accountants to Mr. Jermyn of an unopened mine, at a royalty of 10 cents per ton, when the covenant to erect machinery costing from $75,000 to $80,000 is taken into consideration, requires the amount to be paid for a million of tons to be from 17½ cents to 18½ cents per ton.

Upon the subject of values we have the testimony of Mr. Jermyn himself, an entirely disinterested witness, having a thorough knowledge of the very property in question.  Speaking of the lease of the Archbald' property, to which allusion has been made above, where the rate paid was 14 cents per ton, he explained that the reason for the difference in the sum to be paid by him was that the Archbald mine was above water level, while his was below.  He added positively that he would not have given more than 10 cents a ton for his lease; "I would not do so;" he stated, "because I think there was not anything more in it.  We were at the mercy of the Delaware & Hudson Canal Co., and they could do as they pleased. They could take our coal or not; they could make a contract, and after they made the contract they would not carry it out. They gave us cars whenever they pleased, and gave us just such prices as they pleased.  After they made a lease with us they would not carry it out.  The last lease I made was with the president of the Northern Coal and Iron Company, which was an offspring of the Delaware & Hudson Canal Company. Those are the reasons I would not give more than I had agreed to give, because we could not get the price for it."

If the evidence on this subject were really conflicting, the conduct of the claimants themselves would turn the scale. Every presumption, both of law and fact, is to be made against

one who delays his claim for a period of fourteen years. Three years after the date of the alleged breach of covenant, and five years after the death of the testator, a second account was filed by his executors. If the court has jurisdiction now, it had it no less then, yet no claim was presented. Two years later, the mines themselves were sold by the accountants. One of the claimants negotiated the sale, was in communication with the executors, and received commissions amounting to $10,000 for his services. While the money was in their hands, it would have been natural to have asked for payment of the amount due for the breach of covenant occurring six years before. But no such claim was made, no was there any hint or suggestion of its existence then or during the eight years thereafter, which preceded the presentation of the claim in this court.

The silence and acts of the claimants may not amount to an estoppel, but they are convincing evidence that their claim never had a real existence.

The claim of Winton, Cone & Company is disallowed.

The balance shown by the account is awarded, after payment of clerk's fees, as to six sevenths thereof to Henry C. Gibson and James T. Young, trustees under said will, and as to one seventh to the same persons as guardians of the children of Charles M. Gibson, deceased.

To this adjudication exceptions were filed which were dismissed, and to their dismissal this appeal was taken.

*David C. Harrington* and *F. Carroll Brewster*, for the appellants.—The Orphans' Court had jurisdiction to entertain the claim in this case and make distribution to the claimants.

The covenant of Gibson is a personal covenant and runs with the land, and bound not only the testator, but his personal representatives. It is not a perpetual covenant as in Quain's Appeal, but was certainly binding so long as the Offerman lease had not expired.

From the testimony it is undisputed that mining under the Offerman lease was not completed until 1873.

If no lease had been made prior to this date, the claimants would not have any right under the covenant.

The court below cite and rely upon McBride's Appeal, Braman's Appeal and Quain's Appeal, and other cases as determining the question against the jurisdiction of the court.

In Hunt's Appeal, 14 W. N. C., 377, this court explained Quain's Appeal, and decided it was not to be extended, and Mr. PAXSON, J., says p. 380, " the decision in Quain's Appeal was a necessity growing out of the peculiar facts of that case, and we are not disposed to apply it to cases in which no such

necessity exists.   Were we to do so in the present instance, we would be at a loss where to draw the line.   The general rule is that all personal covenants survive to the executor or administrator of the covenantor, and to take a case out of the rule, there must be something more than the mere fact that the covenant is to be performed in the future."

It is well settled that executors are liable on the personal covenants of the testator: Stephens, N. P., 1134; Rowle on Covts. for Title, 554, and foot notes; McClure *v.* Gamble, 3 Cas., 290.

Not only was this covenant a personal one, which bound his executors who stand in his place, but by his will they not only have authority, but are commanded to lease the premises, and are thus bound to do and keep all his covenants in regard to renting.

It has also been held that a covenant to renew a lease runs with the land:   Stephens, N. P., 1119; Woods on Landlord and Tenant, 666; Washburn on Real Property, 329, and foot note 12; see also Smith Leading Cases, 5th ed., 232.

Unquestionably if a testator directs his executors to continue in a business in which he is engaged, his estate is liable for the contracts and engagements of his executors in the conducting of that business.   This was decided in Miller *v.* Ege, 8 Barr, 352.

The Orphans' Court not only has jurisdiction, but is bound to determine every question that stands in the way of distribution:   Dundas Estate, 23 P. F. S., 474; Otterson *v.* Gallagher, 7 Norris, 355.

The appellants are not chargeable with *laches*.

As the mining was completed in 1878 the right of action did not fully accrue until then; hence, as this claim was presented at the earliest opportunity afforded, the court erred in not allowing it.

We submit if the court below did not wish to determine a disputed question of fact, they had the right to send an issue to the Common Pleas:   Dundas Est., 23 P. F. S., 474.   But the court below having decided against the merits of claim, as well denying the jurisdiction of their own court, the whole case is presented here.

*H. G. Clay* and *George Junken*, for the appellees.—1. The appellants, not being creditors of the testator in any sense of the word, or in any way interested in the distribution of his estate, had clearly no standing in that tribunal.   The Act of 16th June, 1836, provides that the distribution of the assets of and surplusage of the estates of decedents, after settlement of the accounts of executors and administrators, shall be made

among creditors and others interested. It has been judicially determined by this court that no one can claim any part of a decedent's estate in process of distribution by the Orphans' Court, unless it be through him, either as creditor, legatee or next of kin: McBride's Appeal, 22 P. F. S., 480, affirmed by Braman's Appeal, 8 Norris, 79, which further holds that where the wrong was committed by the executors of the decedent, his estate is not liable.

2. If they have any claim they ought to have brought their action at law against the devisees, the lessors to Jermyn, for damages. The devisees only could be liable, and not the estate of the testator in process of distribution: Quain's Appeal, 10 Harris, 510; William's Appeal, 11 Wright, 283. As no suit at law was ever brought against them, there can be no lien against the lands, nor against the proceeds of the sale of them, which formed a part of the account before the Orphans' Court at the audit in 1881.

3. The "refusal" had no validity apart from the lease.

4. The appellants could not legally or otherwise become lessees. The firm of Winton, Cone & Co., were no longer in existence. The surviving partners could not have undertaken to make a lease for a firm no longer in *esse*.

5. The measure of damages could not in any event, exceed the value of the Jermyn lease at the time it was made—*i. e.*, what would have been given for it in addition to the consideration Jermyn gave and agreed to give. This, the testimony shows to have been nothing. In estimating damages, nothing remote, contingent or prospective must be included, nor can any adventitious or speculative matters be taken into view: Navigation Co. *v.* Thoburn, 7 S. & R., 421; Prescott *v.* Otterstatter, 29 P. F. S., 467; Forsyth *v.* Palmer, 2 Harris, 97; Girard *v.* Taggart, 5 S. & R., 32; O'Conner *v.* Forster, 10 Watts, 422; Kountz *v.* Kirkpatrick, 22 P. F. S., 376.

Even if the appellants had paid a consideration for their "refusal," or made payment on account of a lease to be given to them, or had rendered services in connection therewith, the most they could recover, in the absence of fraud, would be the amount of such payment with interest, or the value of their services: McNair *v.* Compton, 11 Casey, 23; Ewing *v.* Thompson, 16 P. F. S., 382; Thompson *v.* Sheplar, 22 P. F. S., 160; Ruckert *v.* Domenec, 2 W. N. C., 195.

It is therefore evident, with all the other difficulties of the appellants' case removed, they could not have recovered more than nominal damages for the loss of their bargain.

6. The culpable laches and extraordinary delay of the claimants in asserting their supposed rights, weighs most

1 AMERMAN—26

heavily against them and would without more, defeat their demands.

Mr. Justice Sterrett delivered the opinion of the Court, February 23d, 1886.

The subject of complaint in the last specification of error is the refusal of the court below to allow·appellants' claim for $150,000 damages and interest thereon. This substantially involves other questions intended to be raised by the preceding specifications; but, inasmuch as the claim was rejected mainly on the ground that it is not within the limited jurisdiction of the Orphans' Court, it becomes unnecessary to consider any of the subordinate questions, unless the court erred in deciding the paramount questions of jurisdiction against appellants. That question has been so fully considered and so satisfactorily disposed of by the learned auditing judge, that it is unnecessary to add anything to what may be found in his able and exhaustive opinion.

The claim of appellants is grounded on an alleged breach in the following clause in the lease of John Gibson to John P. Offerman, dated August 13th, 1858 : "Should the party of the first part grant any other lease to mine coal on any of the said lands, or his other lands on the west side of the Lackawanna river, which lease shall not interfere with the mines that may be opened by the party of the second part, the party of the second part shall have the first refusal of any such lease or leases."

In 1862, Offerman assigned the lease, with all the rights he had by virtue of the same, to W. W. Winton, George Cone, J. M. Chittenden and Samuel Chittenden. To this transfer, John Gibson, the lessor, gave his assent in writing, recognizing the transferees as lessees, and stipulating that at the expiration of the lease.they shall "give full and quiet possession of all the premises hereby leased in as good order and condition as they now are, natural wear and tear or casualties that may accrue by fire or otherwise excepted." In this somewhat qualified assent there is nothing said as to the right of renewal, extension or privilege of refusal; but, as to these, it was doubtless intended they should have all the rights that Offerman had under the original lease. In 1864, Winton and the Chittendens, surviving partners of Winton, Cone & Co., and the administrators of George Cone, then deceased, transferred the same lease to John Jermyn by an instrument containing the following clause : "It is understood that the parties of the first part do not part with any prior rights of leasing mentioned in the Gibson lease."

In March, 1865, John Gibson the original lessor died testate,

and in 1867, Henry C. Gibson and James I. Young, the surviving devisees in trust of the residuary estate of said testator, and also executors of his will, executed a lease to John Jermyn without having first made a tender of it to appellants, who with George Cone, theretofore deceased, were the transferees of Offerman with the assent of the lessor. Appellants, alleging that the lease to Jermyn was a breach of the clause first above quoted, presented their claim for damages against the estate of John Gibson and insisted on their rights to participate in the fund for distribution in the Orphans' Court. The court, as we think, very properly held that they had no jurisdiction of the claim, and for that as well as other valid reasons rejected it.

It cannot be pretended that the testator, John Gibson, violated any agreement he had made with appellants or their assignor. He died nearly two years before the alleged breach occurred. In no proper sense of the word, are appellants creditors of his estate, nor are they in any manner interested in the distribution thereof. It is only those who claim through the decedent, as creditors, legatees, or next of kin, that have any standing in a proceeding for distribution in the Orphans' Court: McBride's Appeal, 72 Pa. St., 480; Braman's Appeal, 89 Id., 78.

The want of jurisdiction in the Orphans' Court is therefore a conclusive answer to appellants' claim; but, waiving that, and conceding the liability of a decedent's estate for such an act of his personal representatives as is here complained of, was there any breach of the clause in question so far as appellants are concerned? We think not. The right of refusal was clearly an inseparable incident of the lease,—a personal right that could be exercised only by the lessee himself as tenant of the devised premises, or by those to whom he assigned the lease with the assent of his lessor; and not a right which the lessee or his assignees could exercise independently of the lease and after he or they had parted therewith. Assuming that appellants and Cone, their co-assignee, acquired the right of refusal by virtue of the assignment of the lease to them, they could exercise it only while they owned the lease of which it was necessarily an incident. When they assigned the lease to Jermyn they lost the right of refusal.

As we have seen the covenant to give first refusal of any subsequent lease was personal, first to the lessee and afterwards to his assignees, who were accepted by the lessor, and thus, to all intents and purposes, became lessees in fact. The lessor never bound himself to give such refusal to the heirs or assigns of the four assignees, nor to the survivors or survivor of them. He may have been quite willing to offer such sub-

[Briggs *v.* Garrett.]

·sequent lease to the four assignees, but not to either three of them; but, however that may have been, it is enough to know that the first refusal was personal to the original lessee, and afterwards to his four assignees, who with the assent of the landlord took his place in the lease. The three surviving assignees of the lease had, therefore, no right to demand that any subsequent lease should be first tendered to them.

Again, as to the question of damages, aside from everything else, the testimony was insufficient to warrant the court in finding in favor of appellants. The prospective lease, of which they claimed the right of refusal, was without terms. What it should embrace, when it should be given, if at all, and on what terms, were wholly in the discretion of the lessor. In no event, therefore, could the damages exceed the value of the lease to Jermyn at the time it was made. There is nothing in the testimony that would have warranted the court in finding it was worth more than the consideration which Jermyn gave or agreed to give for it.

Other reasons might be suggested in support of the decree, but they will be found in the opinion of the court below.

> Decree affirmed and appeal dismissed at the costs of appellants.